**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-1202
_____

UNITED STATES OF AMERICA

v.

WILLIAM JOHNSON

Appellant

_____

No. 14-1184
_____

UNITED STATES OF AMERICA

v.

JERMAINE EDMONDS

Appellant

On Appeal from the United States District Court
for the Western District of Pennsylvania
(No. 12-cr-00232)
District Judge:  Arthur J. Schwab
Submitted Pursuant to Third Circuit LAR 34.1(a)
September 16, 2015

Before:  FISHER, CHAGARES, and JORDAN, Circuit Judges.

(Filed:   October 5, 2015)

———————

OPINION[*]

———————

CHAGARES, <u>Circuit Judge</u>.

William Johnson and Jermaine Edmonds appeal their convictions and sentences for conspiracy and attempt to possess with intent to distribute 500 grams or more of cocaine in violation of 21 U.S.C. § 846. For the following reasons, we will affirm.

I.

Because we write solely for the benefit of the parties, we will only briefly summarize the facts relevant to our decision. In 2012, a grand jury in the Western District of Pennsylvania indicted William Johnson and Jermaine Edmonds for conspiracy and attempt to possess with intent to distribute 500 grams or more of cocaine. The uncontested evidence at trial demonstrated that the charges emanated from a sting operation. While Edmonds was serving time in federal prison, a fellow inmate, Dante Sotelo, offered to connect him with a drug dealer named Fidel Sanchez. Sanchez was in fact a long-serving DEA informant. Following his release, Edmonds contacted Sanchez in an effort to purchase narcotics. The two met in person in July 2012, and over the course of several more conversations, they settled on a quantity and price. Edmonds explained that he would raise funds from "his people" to make the purchase. Appendix ("App.") 156, 494. He also told Sanchez he would have a driver with him when he made the deal. The deal was set for July 31, 2012.

———————

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

On July 31, Edmonds met Sanchez's "contact" Juan — actually Special Agent John Walter — in a restaurant parking lot. When Agent Walter asked to see the money, Edmonds walked him over to a car driven by William Johnson. Johnson then introduced himself and directed Edmonds to show Agent Walter what he claimed was $30,000 in the trunk. The deal stalled for some time as Agent Walter, and Sanchez by phone, demanded that Edmonds show the agreed-upon $90,000. Eventually, another of Edmonds's associates arrived with additional cash, and nearby DEA agents moved in and arrested the would-be buyers.

At trial, Johnson and Edmonds's primary defense was that they believed they were purchasing marijuana rather than cocaine. The Government presented substantial evidence on this point. First, Sanchez testified that his conversations with Edmonds, from the beginning, were exclusively about cocaine. App. 159-60. They used the code word "girls" for powder cocaine,[1] and Sanchez testified he had never used that code, or heard anyone else use that code, for any other drug. App. 159.[2]

Second, the Government called an expert to opine on circumstantial evidence of the drug's identity. With respect to price and quantity, Sanchez testified that the agreed-upon price was around $30,000 per kilogram. App. 159-60.[3] The expert witness explained that, typically, bulk quantities of cocaine are packaged in kilos while bulk

---

[1] In one recorded conversation, for example, Sanchez asks Edmonds to confirm he is ready "for three girls to start working as soon as possible." App. 497.

[2] The Government's expert witness supported Sanchez's testimony that the code word "girl" refers exclusively to cocaine. App. 114.

[3] Edmonds testified that the agreement was for 30 pounds of a rare marijuana that sold for $5,000 to $7,000 per pound. App. 312-13.

quantities of marijuana are packaged in pounds. App. 103-04. He further testified that $30,000 is a slight discount from the average price of $35,000-$36,000 for a kilo of cocaine in western Pennsylvania, but no common quantities of marijuana sell for "three [units] for over $60,000." App. 111.

Recordings of Edmonds and Johnson captured them describing the Pittsburgh market as "dry," App. 494, and prices as "sky high," App. 532. The Government's expert testified that he had never heard of a marijuana shortage in western Pennsylvania, while cocaine "droughts" are common, if often more marketing-ploy than fact. App. 107.

Finally, on the day they arrested Edmonds and Johnson, DEA agents found an unopened box of baking soda with three large Ziploc bags in Johnson's car and a box cutter knife on Edmonds. App. 272, 274. The Government's expert testified that distribution-weight cocaine is often wrapped in duct tape which the buyer must cut to open. App. 103.

In their defense, Johnson and Edmonds sought to persuade the jury that Sanchez lied about the drugs Edmonds agreed to purchase because he knew that the DEA cared more about cocaine than marijuana. Defense counsel asked Sanchez and Sanchez's DEA contact if Dante Sotelo, the inmate who led Edmonds to Sanchez, had received a cooperation benefit for his role in the operation. Both witnesses denied any knowledge of a cooperation agreement. App. 178, 222-23. In fact, the United States Attorney's Office in the Northern District of Georgia had already filed a Rule 35 motion requesting

4

that Sotelo receive a one-level departure based on his cooperation in the investigation and arrest of Edmonds and Johnson.[4] The Government never disclosed the agreement.

The Government also called DEA Agent Louis Gade to testify that during a meeting with Sanchez, Sanchez recounted his conversation with Edmonds without any reference to marijuana. Defense counsel objected to the statement as hearsay. When the Government offered the out-of-court statements as prior consistent statements, defense counsel argued that the statements were not consistent with Sanchez's in-court testimony.[5] The District Court overruled the objection but instructed the jury that they should consider the evidence only if they found it was consistent with the witness's in-court testimony. The District Court did not mention any issues with the timing of the statement.

On August 23, 2013, the jury convicted Edmonds and Johnson on both counts. At sentencing, the Government filed a prior felony information under 21 U.S.C. § 851 for Johnson and Edmonds. The District Court sentenced Johnson to 120 months of imprisonment and Edmonds to 130 months.

Johnson and Edmonds timely appealed.

---

[4] The Rule 35 submission also noted that the federal prosecutor in the Western District of Pennsylvania's United States Attorney's Office considered Sotelo's assistance substantial, which suggests someone in that office was in direct contact with the Northern District of Georgia.

[5] See App. 215 ("It is not our recollection that . . . Mr. Sanchez, testified to the same thing that this agent is testifying to regarding price . . . ."); see also id. at 216 ("So what Mr. Sanchez testified to was I met Mr. Edmonds, and we discussed a three to five-kilo transaction. And that was the extent of his testimony. To then add terms is not consistent.").

We review a district court's evidentiary rulings for abuse of discretion.  United States v. Smith, 725 F.3d 340, 344-45 (3d Cir. 2013).  To establish an abuse of discretion, appellants must demonstrate that the district court's action was "arbitrary, fanciful or clearly unreasonable."  Stecyk v. Bell Helicopter Textron, Inc., 295 F.3d 408, 412 (3d Cir. 2002) (quotation marks omitted).

We review issues not preserved below for plain error.  Puckett v. United States, 556 U.S. 129, 135 (2009) (citing Federal Rule of Criminal Procedure 52(b)).  Under plain error review, we will grant relief only if we conclude that (1) there was an error, (2) the error was "clear or obvious, rather than subject to reasonable dispute" and (3) the error "affected the appellant's substantial rights."  Id.; see also United States v. Stinson, 734 F.3d 180, 184 (3d Cir. 2013); United States v. Fumo, 655 F.3d 288, 325 (3d Cir. 2011).  If those three prongs are satisfied, we have "the discretion to remedy the error— discretion which ought to be exercised only if the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings."  Puckett, 556 U.S. at 135 (alteration in original) (quotation marks omitted).

Finally, "[w]hen reviewing the sentencing decisions of the district courts, we exercise plenary review over legal questions about the meaning of the [S]entencing [G]uidelines, but apply the deferential clearly erroneous standard to factual

---

[6] The District Court had subject-matter jurisdiction under 18 U.S.C. § 3231.  This Court has jurisdiction under 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

determinations underlying their application." United States v. Collado, 975 F.2d 985, 990 (3d Cir. 1992) (quotation marks omitted).

## III.

## A.

Johnson and Edmonds argue that prosecutors committed misconduct warranting a new trial when they failed to disclose that Dante Sotelo received a cooperation benefit.[7] "In Brady v. Maryland, the Supreme Court held 'that the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" Lambert v. Blackwell, 387 F.3d 210, 252 (3d Cir. 2004) (quoting Brady v. Maryland, 373 U.S. 83, 87 (1963)). "[T]o establish a Brady violation requiring relief, a defendant must show that (1) the government withheld evidence, either willfully or inadvertently; (2) the evidence was favorable, either because it was exculpatory or of impeachment value; and (3) the withheld evidence was material." Id. Evidence is material "if there is a 'reasonable probability' that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Kyles v. Whitley, 514 U.S. 419, 433 (1995). This "does not require a demonstration by a preponderance that disclosure . . . would have resulted ultimately in the defendant's acquittal." Id. at 434. Rather, "the materiality standard for Brady claims is met when 'the favorable evidence could reasonably be taken to put the whole case in such a

---

[7] Because they raise this issue for the first time on appeal, our review is for plain error. Puckett v. United States, 556 U.S. 129, 135 (2009).

7

different light as to undermine confidence in the verdict.'" Banks v. Dretke, 540 U.S. 668, 698 (2004) (quoting Kyles, 514 U.S. at 435).

We have previously declined to consider a Brady claim not formally raised and litigated before the District Court. See United States v. Green, 556 F.3d 151, 154 n.2 (3d Cir. 2009). In this case, however, the record contains sufficient evidence for us to evaluate the claim. The allegedly withheld information about Sotelo's cooperation benefit was arguably not material in the Brady sense. Its ostensible purpose was to impeach Sanchez's motive for testifying that Edmonds agreed to purchase cocaine. At trial, defense counsel elicited testimony that Sanchez had assisted the DEA in approximately one hundred cases, App. 175, that he makes his living, in part, as a confidential source, App. 192, that his compensation sometimes takes the form of cooperation benefits for third parties, App. 222, and that he is friends with Sotelo, App. 178.[8] Sanchez testified he had not asked the DEA about Sotelo receiving a cooperation benefit and was not aware of him receiving such a benefit. App. 178. Evidence of a Rule 35 motion filed on Sotelo's behalf would not directly have contradicted Sanchez's statement that he did not know about it. And even if the jury believed that Sanchez did know about the benefit for Sotelo, it would merely add this to the already-established tally of benefits Sanchez expected to receive for his cooperation. There was no question Sanchez expected to benefit from assisting the DEA. Whatever slight impeachment

---

[8]    Q: [Sotelo is] your friend?
       A: Yes.
       Q: Is he a close friend?
       A: Not a friend.  It's someone that I know through my job.
App. 178.

8

value the Rule 35 motion might have had, in the context of the other benefits Sanchez received for his cooperation, we are not persuaded it would have "put the whole case in such a different light as to undermine confidence in the verdict." Kyles, 514 U.S. at 435.[9] Because the existence of a Brady violation in this case is subject to reasonable dispute, the alleged non-disclosure does not amount to plain error.

### B.

Edmonds and Johnson argue that the District Court improperly admitted Agent Gade's testimony regarding Sanchez's debriefing as a prior consistent statement when the out-of-court statements were not clearly prior to Sanchez's motive to lie. The Government argues that the defendants made the wrong hearsay objection and therefore failed to preserve the issue for appeal.

We have held that "a party fails to preserve an evidentiary issue for appeal not only by failing to make a specific objection, . . . but also by making the wrong specific objection." United States v. Iglesias, 535 F.3d 150, 158 (3d Cir. 2008) (quotation marks omitted). This rule ensures that the trial court had an opportunity to "take testimony, receive argument, or otherwise explore the issue raised." United States v. Williams, 264 F.3d, 561, 575 (5th Cir. 2001) (quotation marks omitted). Here, although Edmonds and Johnson made a hearsay objection and addressed their argument to Federal Rule of

---

[9] Nor would evidence of Sotelo's cooperation benefit impeach Sanchez's credibility generally. It would be too speculative to assume that jurors, informed that Sotelo received a benefit, would believe that Sanchez lied that he didn't know about the benefit – particularly when he had freely testified as to the benefits he personally received. That said, we do not condone the Government's failure to disclose the information about the cooperation benefit Sotelo received. Disclosure certainly would have been the better course.

Evidence 801(d)(1)(B), the same rule they invoke on appeal, their exclusive focus on the consistency of the out-of-court statements and their failure to object to the trial court's jury instructions, which mentioned only the consistency question, deprived the trial court of an opportunity to develop fully argument on the timing issue they raise on appeal.[10] The preservation question is a close one. We need not decide the issue, however, because even under the stricter abuse of discretion standard for preserved objections to evidentiary rulings, Edmonds and Johnson fail to demonstrate error.

"[F]our requirements must be met in order for prior consistent statements to be admitted into evidence under Rule 801(d)(1)(B): (1) the declarant must testify at trial and be subject to cross-examination; (2) there must be an express or implied charge of recent fabrication or improper influence or motive of the declarant's testimony; (3) the proponent must offer a prior consistent statement that is consistent with the declarant's challenged in-court testimony; and, (4) the prior consistent statement must be made prior to the time that the supposed motive to falsify arose." United States v. Frazier, 469 F.3d 85, 88 (3d Cir. 2006). There is little record evidence on the timing of the alleged hearsay statement with respect to Sanchez's motive to fabricate. The Government suggested the motive would have arisen either when the defendants first argued that they believed they were purchasing marijuana or, at the very earliest, when the Government first charged the defendants with a cocaine crime. App. 217. The defendants did not respond. They did

---

[10] It is worth noting that the Government did make an argument about the timing of the alleged motive to fabricate. App. 217. Defense counsel did not respond to this argument. Put simply, defense counsel passed up its opportunity to argue the timing or at least alert the District Court that they considered it an element of the objection worth exploring.

10

seek, through witness examination, to suggest that Sanchez might lie because he believed that the DEA cared much more about cocaine than marijuana, see, e.g., App. 221 ("Marijuana is not . . . as interesting as the cocaine and the heroin cases? Is that fair to say?"), but absent evidence of when that belief originated, the District Court would have been hard-pressed to settle the timing issue in their favor. Perhaps if defense counsel had addressed the timing issue before the District Court, the ensuing argument would have clarified the timing question and showed their objection to be meritorious. Based on the record below, however, we cannot say the District Court's implicit acceptance of the Government's view of the timing was unreasonable. Therefore, the District Court did not abuse its discretion in admitting Sanchez's out-of-court statement as a prior consistent statement.

C.

Johnson argues that because there was no evidence that he joined the conspiracy before July 31, 2012, the District Court erred in admitting recordings of Sanchez and Edmonds's pre-July 31 discussions against him.[11] Such out-of-court statements made by a party's co-conspirator are admissible non-hearsay only when made during and in furtherance of a conspiracy. United States v. McGlory, 968 F.2d 309, 333 (3d Cir. 1992) (discussing Federal Rule of Evidence 801(d)(2)(E)). Here, the Government charged Johnson with participating in a conspiracy beginning "[o]n or about July 31, 2012." App. 30. The Government presented no evidence — beyond Edmond's vague references to his

---

[11] Because Johnson did not preserve this issue, our review is for plain error. Puckett, 556 U.S. at 135.

"people" or "guys," App. 494-95 — that Johnson was involved before July 31. However, the District Court instructed the jury to consider pre-conspiracy acts or statements only against the person who performed the act or made the statement. App. 457-58. We ordinarily presume that jurors follow a court's instructions. Greer v. Miller, 483 U.S. 756, 766 n.8 (1987).

While Johnson may wish the District Court's instruction had emphasized the timing of the conspiracy, the instruction was not deficient in any way that would plainly compromise the admission of the recording. Moreover, even if the District Court's instruction were ineffective, Johnson would not be able to show that the admission of the recordings likely affected the outcome of the proceeding, because there was substantially more evidence — including direct testimony regarding the recordings and the price of the drugs — tending to show that Johnson believed he was purchasing cocaine. The District Court did not plainly err in its admission of the recordings.

D.

Johnson also argues that the Government's decision to file for a prior felony enhancement under 21 U.S.C. § 851 was "arbitrary and capricious" given controversy over the enhancement and the fact that on August 12, 2013, the United States Attorney General issued a memorandum advising prosecutors to limit their use of § 851. It is not clear what right Johnson believes the District Court violated by applying the enhancement. The Attorney General's memorandum explicitly did not "create or confer any rights, privileges or benefits," App. 596, and such memoranda do not bind the courts. See United States v. Canori, 737 F.3d 181, 184-85 (2d Cir. 2013) (holding a Department

12

of Justice memorandum on prosecution of marijuana usage was an act of prosecutorial discretion that did not give defendants enforceable rights). Whatever Johnson's policy argument against application of the prior felony enhancement, he does not have a legal argument for why this court should override the decision of a prosecutor acting within the bounds set by Congress. We discern no error in the District Court's sentence.

E.

Finally, Edmonds argues the District Court erred in applying a two-level "organizer-leader" enhancement under U.S.S.G. § 3B1.1(c) when the evidence at trial emphasized that Johnson supplied the money for the deal on July 31 and took over the conversation with the undercover agent. We review a district court's finding as to a defendant's role in a crime for clear error. United States v. Richards, 674 F.3d 215, 221 (3d Cir. 2012).

Under U.S.S.G. § 3B1.1(c), a defendant may receive a two-level sentence enhancement "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity." We have held that this enhancement "is only appropriate if the defendant directed and controlled at least one individual." United States v. Bethancourt, 65 F.3d 1074, 1081 (3d Cir. 1995). Recruitment of accomplices and participation in planning are both factors to be considered in applying the enhancement. U.S.S.G. § 3B1.1 cmt. n.4; see also United States v. Garcia, 413 F.3d 201, 223 (2d Cir. 2005) ("A defendant may properly be considered a manager or supervisor if he . . . played a significant role in the decision to recruit or to supervise lower-level participants." (quotation marks and alteration omitted)).

13

Here, the evidence at trial showed that Johnson brought the money on July 31 and took control of the conversation with Agent Walter. But the evidence also showed that Edmonds was the one who approached Sanchez, recruited Johnson, and set up the deal. In light of Edmonds's primary role in initiating and arranging the crime, we cannot say the District Court's finding that he was an organizer-leader was implausible. Therefore, the District Court did not clearly err in applying the organizer-leader enhancement under U.S.S.G. 3B1.1(c). See Anderson v. City of Bessemer City, 470 U.S. 564, 574 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

## IV.

For the foregoing reasons, we will affirm the judgments of the District Court.